**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------

RYAN O'DELL,                                   :
                                               :
            Plaintiff,                         :     Civil Action No. 22-cv-5246
                                               :
v.                                             :     **COMPLAINT FOR VIOLATIONS OF**
                                               :     **SECTIONS 14(a) AND 20(a) OF THE**
SWITCH, INC., ROB ROY, ANGELA                  :     **SECURITIES EXCHANGE ACT OF**
ARCHON, JASON GENRICH, LIANE                   :     **1934**
PELLETIER, ZAREH SARRAFIAN,                    :
KIMBERLY SHEEHY, DONALD D.                     :     **JURY TRIAL DEMANDED**
SNYDER, TOM THOMAS, and BRYAN                  :
WOLF,                                          :
                                               :
            Defendants.                        :
--------------------------------------------------------

Ryan O'Dell ("Plaintiff"), by and through his attorneys, alleges the following upon

information and belief, including investigation of counsel and review of publicly-available

information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal

knowledge:

1.      This is an action brought by Plaintiff against Switch, Inc. ("Switch or the

"Company") and the members Switch's board of directors (the "Board" or the "Individual

Defendants" and collectively with the Company, the "Defendants") for their violations of Sections

14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a),

78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9 and 17 C.F.R. § 244.100, in connection with the

proposed acquisition of Switch by affiliates of DigitalBridge Group, Inc. ("DigitalBridge").

2.      Defendants have violated the above-referenced sections of the Exchange Act by

causing a materially incomplete and misleading Preliminary Proxy Statement on Schedule 14A

(the "Proxy Statement") to be filed on June 16, 2022 with the United States Securities and

Exchange Commission ("SEC") and disseminated to Company stockholders. The Proxy Statement recommends that Company stockholders vote in favor of a proposed transaction whereby the Sunshine Parent Merger Sub Inc. ("Parent Merger Sub"), a wholly-owned subsidiary of Sunshine Bidco Inc., will merge with and into Switch; and Sunshine Merger, Ltd. ("Company Merger Sub"), a direct wholly-owned subsidiary of the Company, will merge with and into Switch, Ltd. ("Company Ltd.")  with Switch and Company Ltd surviving the transactions as affiliates of DigitalBridge (the "Proposed Transaction"). Pursuant to the terms of the definitive agreement and plan of merger the companies entered into on May 11, 2022 (the "Merger Agreement"), each Switch stockholder will receive $34.25 in cash (the "Merger Consideration") for each Switch share owned.

3.     As discussed below, Defendants have asked Switch's stockholders to support the Proposed Transaction based upon the materially incomplete and misleading representations and information contained in the Proxy Statement, in violation of Sections 14(a) and 20(a) of the Exchange Act.  Specifically, the Proxy Statement contains materially incomplete and misleading information concerning the analyses performed by the Company's financial advisors Goldman Sachs & Co. LLC and Morgan Stanley & Co. LLC in support of their fairness opinions.

4.     It is imperative that the material information that has been omitted from the Proxy Statement is disclosed to the Company's stockholders prior to the forthcoming stockholder vote so that they can properly exercise their corporate suffrage rights.

5.     For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Switch's stockholders or, in the event the

Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

7.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

8.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because the Plaintiff resides in this District.

## PARTIES

9.      Plaintiff is, and has been at all relevant times, the owner of Switch stocks and has held such stocks since prior to the wrongs complained of herein.

10.     Individual Defendant Rob Roy is the Company's Founder and has served as a member of the Board since 2017. Rob Roy is the Company's Chief Executive Officer and Chairman of the Board

11.     Individual Defendant Donald D. Snyder has served as a member of the Board since 2017 and is the Lead Independent Director of the Board.

12.     Individual Defendant Angela Archon has served as a member of the Board since November 2020.

13.     Individual Defendant Jason Genrich has served as a member of the Board since September 2021.

14.     Individual Defendant Liane Pelletier has served as a member of the Board since November 2020.

15.     Individual Defendant Zareh Sarrafian has served as a member of the Board since 2017.

16.     Individual Defendant Kimberly Sheehy has served as a member of the Board since December 2017.

17.     Individual Defendant Tom Thomas has served as a member of the Board since 2017.

18.     Individual Defendant Bryan Wolf has served as a member of the Board since 2017.

19.     Defendant Switch is a Nevada corporation and maintains its principal offices at The Citadel Campus, 1 Superloop Circle, McCarran, Nevada 89434.  The Company's stock trades on the New York Stock Exchange under the symbol "SWCH."

20.     The defendants identified in paragraphs 10-18 are collectively referred to as the "Individual Defendants" or the "Board."

21.     The defendants identified in paragraphs 10-19 are collectively referred to as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

A.     **The Proposed Transaction**

22.     Switch, through its subsidiary, Switch, Ltd., provides colocation space and related services. It develops and operates data centers in Nevada, Michigan, and Georgia. The Company serves technology and digital media companies, financial institutions, government agencies, and

network and telecommunications providers, as well as cloud, IT, and software providers. Switch

was founded in 2000 and is headquartered in Las Vegas, Nevada.

23.     On May 11, 2022, the Company announced the Proposed Transaction:

LAS VEGAS, May 11, 2022 /PRNewswire/ -- Switch, Inc. (NYSE: SWCH) ("Switch") today announced it has entered into a definitive agreement with DigitalBridge Group, Inc. (NYSE: DBRG) ("DigitalBridge"), under which DigitalBridge Partners II, the value-added digital infrastructure equity strategy of the investment management platform of DigitalBridge, and an affiliate of global infrastructure investor IFM Investors ("IFM") will acquire all outstanding common shares of Switch for $34.25 per share in an all-cash transaction valued at approximately $11 billion, including the assumption of debt.

"Today's announcement is an important step towards our long-term vision for the growth and evolution of our company. Through this partnership we will be ideally positioned to continue to meet strong customer demand for Switch's environmentally sustainable Tier 5 data center infrastructure," said Switch Founder and CEO, Rob Roy. "Following our expansion into a Fifth Prime campus last year, and with our plan to construct more than 11 million additional square feet of capacity through 2030, Switch's strategic position has never been stronger. The combination of our advanced data center infrastructure, significant expansion capacity in our land bank, and a new partnership with experienced digital infrastructure investors lays a strong foundation for Switch's continued industry leading growth."

"This transaction provides significant and immediate value to our stockholders, and is a reflection of Switch's industry leading performance and differentiated technology," said Thomas Morton, President of Switch. "Through this transaction, we will remain at the forefront of growth and innovation within the data center industry. Following a robust evaluation of market dynamics and strategic review process by the company and its Board of Directors, we strongly believe that this is the optimal path forward for Switch and our shareholders."

Marc Ganzi, Chief Executive Officer of DigitalBridge, said, "At DigitalBridge, we are building the world's leading global digital infrastructure investment platform, and this transaction allows us to partner with one of the industry's fastest growing and highest quality data center portfolios. Rob and his team share our vision for the future of communications infrastructure, making us the ideal partner

to scale their business both domestically and internationally to meet the exponentially rising demand from large enterprise customers looking for mission critical digital infrastructure. We are also pleased to partner with IFM Investors, one of the world's leading institutional infrastructure investors, to execute this compelling transaction."

"We have a proven track record of accelerating companies' time-to-scale by leveraging our deep domain expertise and access to capital," said Jon Mauck, Senior Managing Director of DigitalBridge Investment Management. "We look forward to supporting Switch's continued growth with the creative solutions and operational expertise necessary to scale these leading assets going forward. This fast-growing and renewables-powered business is a highly complementary fit within our expanding IM business and broader strategic priorities."

Kyle Mangini, Global Head of Infrastructure at IFM, said, "IFM is excited to partner with DigitalBridge and Switch on this transaction. We consider Switch to be an excellent digital infrastructure business with strong potential. The company is a recognized industry leader with an impressive approach to ESG. Today's announcement reflects IFM's strategy of investing in high quality infrastructure to protect and grow the long-term retirement savings of working people."

**Transaction Approvals and Timing**

The transaction, which was unanimously approved by a special committee of the Switch Board of Directors, is expected to close in the second half of 2022. The transaction is subject to approval by Switch stockholders and the satisfaction of other customary closing conditions. Upon completion of the transaction, Switch will no longer be traded or listed on any public securities exchange.

**Advisors**

Goldman Sachs & Co. LLC and Morgan Stanley & Co. LLC acted as financial advisors to the Special Committee of the Board of Directors of Switch, and Latham & Watkins LLP acted as its legal counsel. RBC Capital Markets, LLC served as lead financial advisor and TD Securities served as co-advisor to DigitalBridge and IFM, and Simpson Thacher & Bartlett LLP acted as their legal counsel. Debt financing for the transaction was led by TD Securities along with Joint Lead Arrangers and Joint Lead Bookrunners Societe Generale, RBC Capital Markets, and Citizens Bank, N.A.

* * *

24.     The Board has unanimously agreed to the Proposed Transaction.  It is therefore imperative that Switch's stockholders are provided with the material information that has been omitted from the Proxy Statement, so that they can meaningfully assess whether or not the Proposed Transaction is in their best interests prior to the forthcoming stockholder vote.

**B.      The Materially Incomplete and Misleading Proxy Statement**

25.     On June 16, 2022, Switch filed the Proxy Statement with the SEC in connection with the Proposed Transaction.   The Proxy Statement was furnished to the Company's stockholders and solicits the stockholders to vote in favor of the Proposed Transaction.   The Individual Defendants were obligated to carefully review the Proxy Statement before it was filed with the SEC and disseminated to the Company's stockholders to ensure that it did not contain any material misrepresentations or omissions.   However, the Proxy Statement misrepresents and/or omits material information that is necessary for the Company's stockholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

*Omissions and/or Material Misrepresentations Concerning Financial Projections*

26.     The Proxy Statement fails to provide material information concerning financial projections by Switch management and relied upon by Goldman Sachs and Morgan Stanley in their analyses. The Proxy Statement discloses management-prepared financial projections for the Company which are materially misleading. The Proxy Statement indicates that in connection with the rendering of its fairness opinion, that the Company prepared certain non-public financial forecasts (the "Company Projections") and provided them to the Board and Stifel with forming a view about the stand-alone valuation of the Company. Accordingly, the Proxy Statement should have, but fails to provide, certain information in the projections that Switch management provided

7

to the Board and the Financial Advisors. Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors. Investors can come up with their own estimates of discount rates or [] market multiples. What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007).

27.     For the Company Projections, the Proxy Statement provides values for non-GAAP (Generally Accepted Accounting Principles) financial metrics: Adjusted EBITDA, Adjusted EBIT, Unlevered Free Cash Flow, and Adjusted Funds From Operations, but fails to provide line items used to calculate the metrics and a reconciliation of the non-GAAP metrics to their most comparable GAAP measures, in direct violation of Regulation G and consequently Section 14(a).

28.     When a company discloses non-GAAP financial measures in a Proxy Statement that were relied on by a board of directors to recommend that stockholders exercise their corporate suffrage rights in a particular manner, the company must, pursuant to SEC regulatory mandates, also disclose all projections and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100.

29.     The SEC has noted that:

> companies should be aware that this measure does not have a uniform definition and its title does not describe how it is calculated. Accordingly, a clear description of how this measure is calculated, as well as the necessary reconciliation, should accompany the measure where it is used. Companies should also avoid inappropriate or potentially misleading inferences about its usefulness. For example, "free cash flow" should not be used in a manner that inappropriately implies that the measure represents the

residual cash flow available for discretionary expenditures, since many companies have mandatory debt service requirements or other non-discretionary expenditures that are not deducted from the measure.[1]

30.     Thus, to cure the Proxy Statement and the materially misleading nature of the forecasts under SEC Rule 14a-9 as a result of the omitted information in the Proxy Statement, Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures to make the non-GAAP metrics included in the Proxy Statement not misleading.

*Omissions and/or Material Misrepresentations Concerning Financial Analyses*

31.     With respect to Goldman Sachs' *Selected Companies Analysis*, the Proxy Statement fails to disclose the financial metrics and multiples for each company selected for the analysis.

32.     With respect to Goldman Sachs' *Illustrative Present Value of Future Share Price Analysis*, the Proxy Statement fails to disclose: (i) the inputs and assumptions underlying the NYM EBITDA multiples ranging from 22.0x to 26.0x and P/NNTM AFFO multiples ranging from 21.0x to 25.0x; (iii) Switch's forecasted net debt as of December 31, 2022 to 2024; (iv) the number of projected year-end fully diluted shares of Company common stock for each of the years 2022 to 2024; (v) the inputs and assumptions underlying the use of an illustrative discount rate of 8.2%.

33.     With respect to Goldman Sachs' *Illustrative Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose: (i) the range of illustrative terminal values for Switch; (iii) the inputs and assumptions underlying the use of perpetuity growth rates of 2.0% to 2.5%; (iv) the inputs and assumptions underlying the use of the range of discount rates of 7.0% to 8.0%; (v) the Company's weighted average cost of capital; (vi) and the number of fully-diluted outstanding shares of Switch common stock; and (vii) the net debt of Switch as of March 31, 2022.

---

[1] U.S. Securities and Exchange Commission, Non-GAAP Financial Measures, last updated April 4, 2018, available at: https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm

34.     With respect to Goldman Sachs' *Selected Transaction Analysis*, the Proxy Statement fails to disclose the financial metrics and multiples for each transactions selected for the analysis.

35.     With respect to Goldman Sachs' *Premia Analysis*, the Proxy Statement fails to disclose the companies and the premiums of the transactions observed in the analysis.

36.     The Proxy Statement also fails to disclose if Morgan Stanley conducted any financial analyses or if it issued a fairness opinion to the Board; and the compensation paid to Morgan Stanley for its services in connection with the Proposed Transaction.

37.     In sum, the omission of the above-referenced information renders statements in the Proxy Statement materially incomplete and misleading in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the special stockholder meeting to vote on the Proposed Transaction, Plaintiff will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## CLAIMS FOR RELIEF

### COUNT I

**On Behalf of Plaintiff Against All Defendants for Violations of
Section 14(a) of the Exchange Act and Rule 14a-9 and 17 C.F.R. § 244.100**

38.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

39.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications with stockholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or

misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

40.     Defendants have issued the Proxy Statement with the intention of soliciting stockholder support for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the Proxy Statement and the use of their name in the Proxy Statement, which fails to provide critical information regarding, among other things, the financial projections that were prepared by the Company and relied upon by the Board in recommending the Company's stockholders vote in favor of the Proposed Transaction.

41.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy Statement, but nonetheless failed to obtain and disclose such information to stockholders although they could have done so without extraordinary effort.

42.     Defendants were, at the very least, negligent in preparing and reviewing the Proxy Statement.  The preparation of a Proxy Statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  Defendants were negligent in choosing to omit material information from the Proxy Statement or failing to notice the material omissions in the Proxy Statement upon reviewing it, which they were required to do carefully.  Indeed, Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation and review of strategic alternatives.

43.     The misrepresentations and omissions in the Proxy Statement are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**On Behalf of Plaintiff Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

44.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

45.     The Individual Defendants acted as controlling persons of Switch within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors of Switch, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of Switch, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

46.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

47.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Switch, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations

alleged herein, and exercised the same.  The omitted information identified above was reviewed

by the Board prior to voting on the Proposed Transaction.  The Proxy Statement at issue contains

the unanimous recommendation of the Board to approve the Proposed Transaction.  The Individual

Defendants were thus directly involved in the making of the Proxy Statement.

48.     In addition, as the Proxy Statement sets forth at length, and as described herein, the

Individual  Defendants  were  involved  in  negotiating,  reviewing,  and  approving  the  Merger

Agreement.  The Proxy Statement purports to describe the various issues and information that the

Individual  Defendants  reviewed  and  considered.    The  Individual  Defendants  participated  in

drafting and/or gave their input on the content of those descriptions.

49.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a)

of the Exchange Act.

50.     As set forth above, the Individual Defendants had the ability to exercise control

over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by

their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these

defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate

result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

51.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's

equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that

Defendants' actions threaten to inflict.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff demands injunctive relief in his favor and against the Defendants

jointly and severally, as follows:

A.     Preliminarily  and  permanently  enjoining  Defendants  and  their  counsel,  agents,

employees and all persons acting under, in concert with, or for them, from proceeding with,

consummating, or closing the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy Statement;

   B.  Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiff rescissory damages;

   C.  Directing the Defendants to account to Plaintiff for all damages suffered as a result of their wrongdoing;

   D.  Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

   E.  Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

   Plaintiff demands a trial by jury.

Dated: June 6, 2022        **MELWANI & CHAN LLP**

         By: */s/ Gloria Kui Melwani*
           Gloria Kui Melwani
           1180 Avenue of the Americas, 8th Fl.
           New York, NY 10036
           Telephone: (212) 382-4620
           Email: gloria@melwanichan.com

           *Attorneys for Plaintiff*